**The Honorable Alcee L. HASTINGS, Plaintiff,**

v.

**JUDICIAL CONFERENCE OF the UNITED STATES, et al., Defendants.**

**Civ. A. No. 83–3850.**

United States District Court, District of Columbia.

July 25, 1984.

Terence J. Anderson, Robert S. Catz, Coral Gables, Fla., John Karr, Washington, D.C., for plaintiff.

Brook Hedge, Sandra M. Schraibman, Ann M. Sheadel, Dept. of Justice, Washington, D.C., John Doar, New York City, G. Stewart Webb, Jr., Baltimore, Md., for defendants.

## MEMORANDUM

GESELL, District Judge.

United States District Judge Alcee L. Hastings brought this action seeking to enjoin an ongoing investigation of his judicial conduct by an investigative committee of the Judicial Council of the Eleventh Circuit. The investigation was begun pursuant to the Judicial Councils Reform and Judicial Conduct and Disability Act of 1980, Pub.L. No. 96–458, 94 Stat. 2035 (1980), 28 U.S.C. §§ 331, 332, 372(c), 604. Judge Hastings seeks a declaration that the Act is unconstitutional on its face and as applied to him. These issues are before this Court on cross-motions for partial summary judgment, which have been fully briefed and argued,[1] along with the defendants' motion to dismiss certain counts on grounds of ripeness and subject-matter jurisdiction.

Judge Hastings filed this action on December 23, 1983. The amended complaint names as defendants the Judicial Conference of the United States, the governing body of the federal court system on which all circuits are represented by a circuit judge and a district judge; the Chief Justice of the United States in his official capacity as presiding officer of the Conference; the Standing Committee of the Judicial Conference;[2] the Judicial Council of the Eleventh Circuit, the governing body of judges for that circuit; the Chief Judge of the Eleventh Circuit, John C. Godbold; the members of the Investigating Committee, Judges Godbold, Tjoflat, Johnson, Pointer and O'Kelley;[3] and, in Count Four, the Attorney General of the United States, William French Smith, who is joined with other defendants in a Privacy Act claim.[4]

While the complaint states a multitude of prolix and sometimes inconsistent constitutional claims, Judge Hastings' basic contentions are: (1) that the Act interferes with the constitutional guarantee of an independent judiciary by providing machinery for disciplining judges and delegating impeachment powers to the judiciary, in violation of the separation of powers doctrine, and (2) that the Act, both on its face and as applied to him, violates due process rights.

### I. *The Act*

The Judicial Councils Reform and Judicial Conduct and Disability Act of 1980 culminated nearly 50 years of consideration by Congress and the federal judiciary of the best means to assure responsible judicial conduct consistent with the constitutionally protected independence of the judicial branch.

At the urging of Chief Justice Hughes and other distinguished federal judges, Congress in 1939 created judicial councils for each circuit empowering them to "make all necessary orders for the effective and expeditious administration of the business of the courts" in each circuit. *Administrative Office Act of 1939*, Pub.L. No. 76–299, 53 Stat. 1223, 28 U.S.C. § 332. Under this authority the judicial branch has proceeded to run its affairs by negotiation, rules and persuasion. In 1970, the Supreme Court in *Chandler v. Judicial Council of the Tenth Circuit*, 398 U.S. 74,

---

1. The Washington Legal Foundation has filed a brief *amicus* supporting defendants.

2. The Conference has named a Standing Committee as authorized by the Act to exercise the power of the Conference over judicial conduct matters. See 28 U.S.C. §§ 331, 372(c)(10), (12), (14), (15). This committee is known as the Committee to Review Circuit Council Conduct and Disability Orders. It is referred to herein as the Standing Committee.

3. Judges in the Eleventh Circuit named defendants and that Circuit's Judicial Council have waived objections to venue. Other preliminary issues going to the Court's jurisdiction are discussed later.

4. The amended complaint contains four counts. Count One claims that the Act on its face violates the separation of powers doctrine and the due process rights of judges under inquiry. Count Two, while incorporating the Count One claims, focuses on the application of the Act to Judge Hastings, alleging that the investigation of him has already violated his due process rights and will violate his rights in the future. Count Three alleges a conspiracy among Judges of the Eleventh Circuit to violate plaintiff's constitutional rights, and Count Four is the Privacy Act count.

90 S.Ct. 1648, 26 L.Ed.2d 100 (1970), noted that it was "reasonable, proper, and necessary" for the federal courts to have rules governing the management of court business and that "the need for enforcement [of such rules] cannot reasonably be doubted." *Id.* at 85, 90 S.Ct. at 1654. But the Court expressed concern about the lack of specificity in the 1939 Act's definition of the scope of the judicial councils' powers and called for legislation to clarify the enforcement power of the councils against recalcitrant judges and the method of review of their orders. *Id.* at 85 n. 6, 90 S.Ct. at 1654 n. 6.

The 1980 Act evolved from this background after long and careful legislative deliberation. Congress was acutely aware of the need both to preserve fundamental judicial independence and at the same time to enable the judiciary "to put its own house in order" by providing tools to implement the judiciary's own disciplinary procedures where necessary to assure judicial accountability. Both House and Senate leaders agreed that

> The goals of the ... legislation are to improve judicial accountability and ethics, to promote respect for the principle that the appearance of justice is an integral element of this country's justice system, and, at the same time, to maintain the independence and autonomy of the judicial branch of government.

H.R.Rep. 1313, 96th Cong., 2d Sess. 1 (1980); 126 Cong.Rec. S13,858 (daily ed. Sept. 30, 1980) (remarks of Sen. DeConcini).

As will be seen from the analysis of the Act that follows, the judicial councils were authorized to hold investigative hearings aided by subpoena power and impose specific sanctions short of removal from office. Procedures for receiving and processing complaints from the public were also enacted to promote public confidence in the federal judiciary.

This formal investigative machinery was expected to be rarely used. Congress emphasized, as did many judges and others supporting the legislation, that informal resolutions by negotiation, discussion and debate among judges were to be preferred and should continue to be used as under the 1939 Act. S.Rep. No. 362, 96th Cong., 1st Sess. 3–4 (1979), *reprinted in* 1980 U.S.Code Cong. & Ad.News 4315, 4316, 4317. However, it was equally clear that on occasion informal resolution would prove ineffective due to the nature of the issue presented, factual disputes or stubborn intransigence.

The Act provides that any person alleging that a judge "has engaged in conduct prejudicial to the effective and expeditious administration of the business of the courts, or alleging that such a judge ... is unable to discharge all the duties of office by reason of mental or physical disability," may file a written complaint with the clerk of the court of appeals for that circuit, 28 U.S.C. § 372(c)(1), which the clerk is required to send to the judge involved and to the Chief Judge of the circuit.

If the Chief Judge does not dismiss the complaint[5] or conclude the proceeding on grounds that corrective action has been taken, 28 U.S.C. § 372(c)(3)(B), he must appoint a special committee, as was done in this case, consisting of himself and equal numbers of district and circuit judges of the circuit, to investigate the complaint. 28 U.S.C. § 372(c)(4)(A).

The judge under inquiry has a right to "adequate prior notice of any investigation." 28 U.S.C. § 372(c)(11)(A). He or she also is entitled to "an opportunity to appear (in person or by counsel) at proceedings conducted by the investigating panel, to present oral and documentary evidence, to compel the attendance of witnesses or the production of documents, to cross-examine

---

5. The statute provides for dismissal by the chief judge if he finds a complaint "frivolous," "directly related to the merits of a decision or procedural ruling," or not in conformity with the Act's complaint-filing requirement. 28 U.S.C. § 372(c)(3)(A). As of June 30, 1983, 237 complaints had been filed since the Act took effect. Six of those proceeded to the investigative stage.

witnesses, and to present argument orally or in writing." [6] 28 U.S.C. § 372(c)(11)(B).

The investigating committee is charged with conducting an "investigation as extensive as it considers necessary," and to expeditiously file a written report with the circuit's judicial council stating the committee's findings and recommended action. 28 U.S.C. § 372(c)(5). The committee, like the judge, has "full subpoena powers." 28 U.S.C. § 372(c)(9)(A).

The judicial council then "shall take such action as is appropriate to assure the effective and expeditious administration of the business of the courts within the circuit." 28 U.S.C. § 372(c)(6)(B). Such action may include, but is not limited to, censuring or reprimanding the judge publicly or privately, temporarily "for a time certain" ordering that no new cases be assigned to the judge, requesting that the judge voluntarily retire at full salary, or certifying the disability of the judge.[7] 28 U.S.C. § 372(c)(6)(B). However, the council cannot remove from office any judge appointed to hold office during good behavior. 28 U.S.C. § 372(c)(6)(B)(vii)(I).

Written notice of any action taken must be sent immediately to the judge under inquiry and to the complainant, and also is to be available to the public in the clerk's office of that circuit's court of appeals.[8] 28 U.S.C. § 372(c)(6)(C), (15). The judicial council may conduct any further investigation it believes necessary before action on the investigating committee's recommendation, and subpoena power is provided, 28 U.S.C. § 372(c)(6)(A).

The council has discretion to refer any complaint and record of related proceedings to the Judicial Conference of the United States. 28 U.S.C. § 372(c)(7)(A). In addition, if the council determines that the judge has engaged in impeachable conduct or conduct which "in the interest of justice, is not amenable to resolution by the judicial council," the council must certify such a finding, together with any complaint and a record of any associated proceedings, to the Judicial Conference. 28 U.S.C. § 372(c)(7)(A), (B).[9]

The Judicial Conference may affirm or reject the Council's action.[10] It may conduct further investigation of any matters referred to it by the judicial councils and has the same range of disciplinary actions open to it as to the councils. In addition, if it determines that Congress should consider impeachment, it shall send that finding to the House of Representatives along with any record of proceedings for whatever independent action the House considers appropriate. 28 U.S.C. § 372(c)(8).

The Judge under inquiry may ask the Judicial Conference, or a Standing Committee of the Conference appointed under the Act, to review the action taken by the Judicial Council. No other judicial review of council or conference action is allowed. 28 U.S.C. § 372(c)(10).

## II. *The Investigation*

This formal statutory mechanism was invoked in March, 1983, against Judge Hastings, one of 12 active United States District Judges for the Southern District of

---

**6.** The Act specifies these rules as the minimum due process safeguards to be contained in rules established by each judicial council and the Conference for the conduct of proceedings. Councils are free to provide greater protections, and some have done so. *See generally* Burbank, *Procedural Rulemaking Under the Judicial Councils Reform and Judicial Conduct and Disability Act of 1980,* 131 U.Pa.L.Rev. 283 (1982). The Eleventh Circuit rules generally track the Act's provisions. See *id.*

**7.** See 28 U.S.C. § 372(b) for the procedures following a certification of disability.

**8.** Actions taken by the Judicial Conference or its standing committee also are to be made avail-

able to the public in the clerk's office of the appropriate circuit. All such orders are to be accompanied by written reasons "[u]nless contrary to the interests of justice." 28 U.S.C. § 372(c)(15).

**9.** The council must notify the complainant and the judge of such action "unless contrary to the interests of justice." 28 U.S.C. § 372(c)(7)(C).

**10.** The Conference may delegate its powers under 28 U.S.C. § 372(c) to a Standing Committee. 28 U.S.C. § 331. The Conference has done so. *See* n. 2 *supra.*

Florida, following his trial and acquittal on criminal charges of bribery and obstruction of justice.

Judge Hastings was appointed in 1979. He was indicted on December 29, 1981, charged along with William Borders, then a Washington, D.C. attorney, with conspiring "corruptly to ask, solicit, seek, accept, receive and agree to receive, directly or indirectly, a sum of money for themselves in return for defendant Alcee L. Hastings being influenced in his performance of official acts as a United States District Judge." The indictment also alleged that Judge Hastings and Borders "obstruct[ed] and impede[d] the due administration of Justice," in that Judge Hastings "disclose[d] to ... Borders ... the substance of a judicial order ... that had not yet been issued," gave "advance notice as to when a judicial order ... would be issued," and that Borders revealed that information to a person he believed to be a defendant in that case.

Judge Hastings moved to quash the indictment, contending that Congress alone can punish a federal judge for high crimes and misdemeanors through the impeachment process, and that the executive may not prosecute a sitting federal judge for his official acts. The motion was denied, and the denial was affirmed on appeal. *United States v. Hastings*, 681 F.2d 706 (11th Cir. 1982), *cert. denied*, 459 U.S. 1203, 103 S.Ct. 1188, 75 L.Ed.2d 434 (1983). The two defendants then had separate trials.

Borders was tried first, in Atlanta. He was convicted of the bribery and obstruction counts as well as two other charges filed against him alone. Borders did not testify. The sufficiency of evidence for the conspiracy conviction of Borders was upheld on appeal in an opinion that recited in detail the evidence against Hastings. *See United States v. Borders*, 693 F.2d 1318 (11th Cir.1982), *cert. denied*, 461 U.S. 905, 103 S.Ct. 1875, 76 L.Ed.2d 807 (1983). Confronted with the fact that Judge Hastings

was the only alleged co-conspirator, the Court determined in affirming the jury's conviction of Borders on the conspiracy count that the jury must have on all the evidence properly concluded that Judge Hastings had conspired with Borders.

Judge Hastings was then tried in Miami and was acquitted on Feb. 4, 1983, because of the government's failure to meet the reasonable doubt standard.

On March 17, 1983, two judges [11] filed with the Eleventh Circuit a verified complaint invoking the Act against Judge Hastings. The complaint alleged that Judge Hastings had engaged in conduct prejudicial to the effective and expeditious administration of the business of the courts and had violated several Canons of the Code of Judicial Conduct for United States Judges, adopted by the Judicial Conference of the United States. It focused on Judge Hastings' alleged conduct that gave rise to the indictment and on other conduct revealed and statements made by Judge Hastings in the course of the criminal proceedings.

Specifically, the complaining judges alleged that, in violation of the Code of Judicial Conduct: (1) Judge Hastings had conspired with Borders to obtain a bribe in return for an official judicial act; (2) Judge Hastings made "public and unfounded statements" that the United States was prosecuting him on racial/political grounds; (3) Judge Hastings knowingly and publicly exploited his judicial position or acquiesced in such exploitation by others acting on his behalf by accepting financial donations from lawyers and other members of the public to defray the costs of his criminal defense; (4) Judge Hastings, by his own testimony, had allowed *ex parte* contacts between his law clerk and counsel in pending cases concerning substantive issues in those cases and concerning the content of orders and opinions not yet entered, and had "completely abdicated and delegated" his judicial decision-making authority to his

---

**11.** The complainants were Chief Judge William Terrell Hodges, of the U.S. District Court for the Middle District of Florida, and Chief Judge Anthony A. Alaimo, of the U.S. District Court for the Southern District of Georgia. Both are members of the Eleventh Circuit Judicial Council.

law clerk; (5) Judge Hastings, by his own testimony, had told counsel in a judicial proceeding that he had read an important precedent when he knew he had not and explained his deception by implying that it was common for judges to make such deliberate misstatements; (6) Judge Hastings, by his own testimony, had exploited his judicial position by soliciting funds for someone he knew was a convicted federal offender.

On March 29, 1983, in response to the complaint, John C. Godbold, Chief Judge of the Eleventh Circuit, appointed to an investigating committee himself, United States Circuit Judges Gerald Bard Tjoflat and Frank M. Johnson, and United States District Judges Sam C. Pointer and William C. O'Kelley. The committee named John Doar, Esquire, a private attorney, as its counsel. On April 15, 1983, a news release was issued through the clerk's office of the Court of Appeals for the Eleventh Circuit, at the direction of Judge Godbold, announcing the filing of the complaint and the appointment of the investigating committee and Mr. Doar.

Judge Godbold refused Judge Hastings' request that all documents and proceedings be opened to the public. Judge Hastings also asked the United States to pay the costs of his defense. On May 6, 1983, the Director of the Administrative Office of the United States Courts advised Judge Hastings that the Office had no authority to do so.

On June 3, 1983, the Investigating Committee filed a petition with the United States District Court for the Southern District of Florida for access to the materials of the grand jury that had indicted Borders and Judge Hastings. The Court granted the petition and at the same time denied Judge Hastings access to the materials,[12] holding that his request was premature since the Committee's work was still at the investigative stage where "the required procedural protections are minimal at most." *In re Petition to Inspect and Copy Grand Jury Materials*, 576 F.Supp. 1275, 1284 (S.D.Fla.1983), *aff'd*, 735 F.2d 1261 (11th Cir.1984).[13]

The Investigating Committee has not completed its work. No report has been filed containing its recommendations nor have any hearings been held. Committee counsel indicated at oral argument that the inquiry awaits action by this Court on the motions.

### III. *Preliminary Issues*

It is against this background that the Court must first consider several threshold issues raised by the defendants concerning this Court's jurisdiction over the subject matter of the complaint and ripeness of the various claims for review. The Act provides that "all orders and determinations, including denials of petitions for review, shall be final and conclusive and shall not be judicially reviewable on appeal or otherwise." 28 U.S.C. § 372(c)(10). Defendants contend this withdrawal of jurisdiction precludes any review by this Court of Judge Hastings' claims in Count Two regarding the application of the Act to him. While there is always a basic presumption of judicial review and a Congressional intent to preclude review must be explicit, *see Abbott Laboratories v. Gardner*, 387 U.S. 136, 140, 87 S.Ct. 1507, 1510, 18 L.Ed.2d 681 (1967), the language of the Act

---

**12.** Judge Hastings also sought and was denied full public disclosure of the grand jury materials as an alternative to his request that the Investigating Committee be denied disclosure.

**13.** Both the petition in the District Court and the appeal were heard by designated judges because all the judges of the District Court of the Southern District of Florida recused themselves, as did all the regular judges of the Court of Appeals for the Eleventh Circuit. The judges of the District Court of the Southern District of Florida have recused themselves in all matters relating to the complaint against Judge Hastings. In another somewhat related case, the appeal from and mandamus relating to Judge Hastings' decision that was allegedly influenced by a bribe, *United States v. Romano*, 523 F.Supp. 1209 (S.D.Fla.1981), a panel of the Eleventh Circuit refused Judge Hastings' request that all active judges of the Circuit recuse.

and its legislative history [14] plainly show that Congress intended to establish an absolute bar against judges under inquiry seeking judicial review of actions taken against them pursuant to the Act. Congress's power to preclude such judicial review is well established. *Cf. Briscoe v. Bell,* 432 U.S. 404, 414–15, 97 S.Ct. 2428, 2434, 53 L.Ed.2d 439 (1977); *Weinberger v. Salfi,* 422 U.S. 749, 762, 95 S.Ct. 2457, 2465, 45 L.Ed.2d 522 (1975).[15] Accordingly, this Court must conclude it has no jurisdiction over Judge Hastings' Count Two claims concerning the present and possible future application of the Act to him.

■ However, the Act does not bar judicial review of the facial validity of the statute itself. By its terms, the Act bars review only of "orders and determinations" made against individual judges. 28 U.S.C. § 372(c)(10). This was not meant to bar review of the constitutionality of the Act itself. Moreover, it is doubtful whether Congress has the power to withdraw jurisdiction from the courts of a statute's facial validity. *See Johnson v. Robison,* 415 U.S. 361, 366–67, 94 S.Ct. 1160, 1165, 39 L.Ed.2d 389 (1974). Accordingly, this Court finds it does have subject-matter jurisdiction over plaintiff's Count One claims regarding the facial validity of the Act.

■ Defendants next claim in regard to Count One that the "only issue ripe for review is. whether it is constitutional for judges to investigate judges for conduct alleged to prejudice the effective and efficient administration of the courts." Defendants' Reply filed July 5, 1984, at 3, 5. They insist that because the Judicial Council, the Judicial Conference, and the Standing Committee have not yet taken any action in Judge Hastings' case, the facial validity of the Act is too hypothetical for adjudication as to them. To so hold would

prevent full judicial review of the constitutionality of the Act, because as soon as these bodies act the defendants will no doubt assert that orders issued are unreviewable. In any event, the facts do not support a ripeness challenge. The situation here is far different from those cases where a lack of ripeness was properly found because neither the plaintiff nor the defendant agencies had engaged in conduct triggering the requisite claimed injury. *See, e.g., International Longshoremen's and Warehousemen's Union, Local 37 v. Boyd,* 347 U.S. 222, 224, 74 S.Ct. 447, 448, 98 L.Ed. 650 (1954); *Martin Tractor Co. v. Federal Election Comm.,* 627 F.2d 375, 379 (D.C.Cir.), *cert. denied,* 449 U.S. 954, 101 S.Ct. 360, 66 L.Ed.2d 218 (1980). Judge Hastings has allegedly engaged in conduct triggering the Investigating Committee's present work. Given the seriousness of the misconduct alleged, it seems disingenuous for defendants to suggest that action by the Judicial Council, the Standing Committee or the Conference is remote and uncertain in his case. Nor would the occurrence of any future acts provide significant new facts to aid this Court's adjudication of the Act's facial validity. *See Duke Power Co. v. Carolina Environmental Study Group,* 438 U.S. 59, 82, 98 S.Ct. 2620, 2635, 57 L.Ed.2d 595 (1978); *Regional Rail Reorganization Act Cases,* 419 U.S. 102, 143, 95 S.Ct. 335, 358, 42 L.Ed.2d 320 (1974). Principles of judicial economy also counsel against piecemeal adjudication of Judge Hastings' broad complaint, directed as it is to all aspects of the Act. The motion to dismiss on ripeness grounds is accordingly denied.

### IV. *Judge Hastings' Constitutional Claims*

This Court therefore must now address the plaintiff's constitutional claims.

---

14. *See* H.R.Rep. 1313, 96th Cong., 2d Sess. 13 (1980).

15. Whether the Due Process clause bars Congress from denying judicial review of orders and determinations under the Act is not a contention specifically raised by plaintiff's amended complaint. Given the extensive rights of review the Act does provide before mature judges of the Judicial Conference and the coun-

cils, this Court holds that the absence of more formal judicial review does not violate the Due Process clause. *See Crowell v. Benson,* 285 U.S. 22, 87, 52 S.Ct. 285, 306, 76 L.Ed. 598 (1932) (Brandeis, J., dissenting); *Battaglia v. General Motors Corp.,* 169 F.2d 254, 257 (2d Cir.), *cert. denied,* 335 U.S. 887, 69 S.Ct. 236, 93 L.Ed. 425 (1948).

## A. *Separation of Powers*

■ Judge Hastings initially contends that Congress wholly lacks power to provide the judiciary with machinery for disciplining Article III judges because the separation of powers doctrine prevents any intrusion by the legislature into the independence of the judiciary as guaranteed by the Constitution. He focuses particularly on the delegation by Congress of subpoena power to the judiciary coupled with the grants of authority to discipline judges including the provision authorizing the Judicial Conference to present facts obtained by this process to the House of Representatives with recommendation for impeachment. Judge Hastings goes so far as to suggest that under the Constitution an Article III judge such as himself can only be disciplined for misconduct [16] by impeachment, and that proceedings questioning his behavior can only be held by the appropriate bodies of Congress.

Judge Hastings misconceives the purposes of the Act and his obligations as a member of the judiciary. His argument lacks merit.

The Framers of the Constitution regarded an independent judiciary, free from the fear and favor of other branches of the national government, as vital to safeguard the liberty of the people and the integrity of the government. *See The Federalist* No. 78, at 226–33, No. 81, at 242–45 (A. Hamilton) (R. Fairfield ed. 1966); 2 J. Story, *Commentaries on the Constitution of the United States* 391–92 (5th ed. 1891). The independence of the judicial branch was to be secured in part by providing the individual judges with life tenure on good

behavior and a salary secure from reduction. U.S. Const., art. III, sec. 1. These provisions were meant to satisfy "the imperative need for total and absolute independence of judges in deciding cases." *Chandler v. Judicial Council,* 398 U.S. at 84, 90 S.Ct. at 1653. But in establishing a government of separated and interdependent powers, the Framers never intended that the independence of any officeholder, including judges, be so absolute as to threaten the integrity and orderly functioning of that officeholder's branch of government. The Framers, after all, feared nothing more than the tyranny of megalomaniacal despots. Thus the Constitution established, and the cases have repeatedly recognized, that the integrity and independence of the branch must take precedence over the independence of the individual officeholder. *See, e.g., United States v. Nixon,* 418 U.S. 683, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974); *Nixon v. Administrator of General Services,* 433 U.S. 425, 441, 97 S.Ct. 2777, 2789, 53 L.Ed.2d 867 (1977); *United States v. Brewster,* 408 U.S. 501, 92 S.Ct. 2531, 33 L.Ed.2d 507 (1972).[17]

From the early days of the Republic, limitations have been placed on the independence of any individual federal judge in order to assure the integrity and independence of the judicial branch. The first Congress recognized that a judge could be subject to criminal trial and provided that upon any conviction for bribery, he or she was to be "forever disqualified to hold any office." Act of 1790, ch. 9, sec. 21, 1 Stat. 117.[18] In the Judiciary Act of 1789, 1 Stat. 73, the first Congress

16. By misconduct, he means a violation of the "good behavior" standard set out in Article III and in every judge's commission of appointment by the President. He concedes that bribery violates good behavior.

17. As the Court observed in *Brewster,* regarding Speech or Debate Clause immunities of Congressmen designed to provide protections for the independence of that branch analogous to those considered today: "The immunities of the Speech or Debate Clause were not written into the Constitution simply for the personal or private benefit of Members of Congress, but to

protect the integrity of the legislative process by insuring the independence of individual legislators." 408 U.S. at 507, 92 S.Ct. at 2535.

18. The Act also provided that a judge convicted of bribery could be fined and jailed, at the court's discretion. *Id.* Subsequent cases, including Judge Hastings' own criminal trial, have disposed of the notion that a sitting federal judge cannot be brought to criminal trial until he is removed from office by impeachment. *See United States v. Claiborne,* 727 F.2d 842 (9th Cir.1984); *United States v. Hastings,* 681 F.2d 706 (11th Cir.1982), *cert. denied,* 459 U.S. 1203,

provided not only for the size and composition of the Supreme Court but also for the times and place for sitting, its internal organization, and other matters. It created inferior courts and prescribed membership, terms, places of sitting, and jurisdiction.

Killian, *Constitutional Issues Raised by the Proposed Judicial Conduct and Disability Act of 1979, reprinted in Judicial Tenure and Discipline—1979–80: Hearings before the Subcommittee on Courts, Civil Liberties, and the Administration of Justice,* 96th Cong., 1st and 2d Sess. 705 (1980). In addition, Congress required a judge with an interest in a case to recuse, Act of May 8, 1792, ch. 36, sec. 11, 1 Stat. 278 (codified at 28 U.S.C. § 455), and made it a "high misdemeanor" for a judge to practice law, Act of December 18, 1812, ch. 5, 2 Stat. 788 (codified at 28 U.S.C. § 454). Since those early years, Congress has placed limits on individual Article III judges in many other ways, such as requiring disclosure of personal wealth (and penalizing nondisclosure),[19] mandating that criminal trials be conducted within a specified time,[20] and prescribing various procedural rules.[21] Congress's power to enact these and other limitations on the personal freedom of individual federal judges, pursuant to its power to make all laws "necessary and proper for carrying into Execution" the powers vested by the Constitution in the judiciary, art. I, sec. 8, cl. 18, cannot any longer be seriously doubted.

As the third branch of government, the judiciary must function. It must organize, it must have rules, it must be effectively managed. To suggest that the judicial branch consists only of individual judges free to work or not work, cooperate or obstruct, uphold or demean court processes, acting however personal whim may dictate checked only by the remote chance of loss of office through impeachment, is naive and irresponsible. The independence of the judiciary depends both on the courage and integrity of individual judges and on the public perception of the institution as fair, impartial and efficient. The judiciary has the inherent power to govern itself in a manner that will achieve these ends.

The Judicial Councils Reform and Judicial Conduct and Disability Act of 1980 represents a legitimate exercise of Congress's "necessary and proper" power to effectuate that judicial power. By redefining the composition of the Judicial Councils and enhancing and perfecting their inherent authority, Congress was in no respect intruding upon judicial independence. Rather, it was simply recognizing the need to give the courts reasonable means to put the judiciary's own house in order. *See Chandler v. Judicial Council,* 398 U.S. at 85, 86 n. 7, 90 S.Ct. at 1654 n. 7. *Cf. Nixon v. Administrator of General Services,* 433 U.S. at 443–44, 97 S.Ct. at 2790. The Judicial Conference itself has recognized that placing disciplinary machinery within the judicial branch is "least disruptive of our constitutional concept of an independent judiciary." *Judicial Tenure and Discipline —1979–80: Hearings before the Subcommittee on Courts, Civil Liberties, and the Administration of Justice,* 96th Cong., 1st and 2d Sess. 68 (1980) (statement of Hon. Elmo B. Hunter, chairman, Committee on Court Administration of the Judicial Conference of the United States).

Moreover, the Act's provision for recommending impeachment to the House of

---

103 S.Ct. 1188, 75 L.Ed.2d 434 (1983); *United States v. Isaacs,* 493 F.2d 1124 (7th Cir.), *cert. denied sub nom. Kerner v. United States,* 417 U.S. 976, 94 S.Ct. 3183, 41 L.Ed.2d 1146 (1974).

**19.** Ethics in Government Act of 1978, 28 U.S.C. App. § 301 *et seq.* The Act's constitutionality as applied to judges was upheld in *Duplantier v. United States,* 606 F.2d 654 (5th Cir.1979), *cert. denied,* 449 U.S. 1076, 101 S.Ct. 854, 66 L.Ed.2d 798 (1981).

**20.** Speedy Trial Act of 1972, 18 U.S.C. § 3161 *et seq.* A claim that the Act was an "unconstitutional encroachment on the judiciary" was rejected in *United States v. Brainer,* 691 F.2d 691 (4th Cir.1982).

**21.** *See, e.g., Hanna v. Plumer,* 380 U.S. 460, 471–72, 85 S.Ct. 1136, 1143–44, 14 L.Ed.2d 8 (1965) (upholding congressional power under the Necessary and Proper Clause to set rules for civil procedure in federal courts).

Representatives does nothing to impinge on the exclusive power of Congress over impeachment. The Judicial Conference as the highest manager of the third branch is surely entitled with or without benefit of the Act to seek the aid of Congress where removal of a judge is appropriate. If the Judicial Conference forwards an impeachment recommendation to the House of Representatives, the House is free to pursue the matter or ignore it as it chooses. Nor has the Congress made any change in its procedures or impeachment standards. There is nothing in the Constitution that bars any person or group from recommending impeachment. Judges have always been subject to this hazard and the repercussions it may carry.

Judge Hastings also contends that the impeachment provision of Article II somehow shields him from any discipline short of impeachment. But even if one accepts the much-debated proposition that impeachment is the sole means of removing an Article III judge from office, it simply does not follow that other forms of discipline that do not remove a judge from office are foreclosed.[22] *Cf. Nixon v. Sirica,* 487 F.2d 700, 711 (D.C.Cir.1973) (en banc), holding that the impeachment clause does not provide special immunities from other investigative processes.

To the extent Judge Hastings seems to believe that the independence of the judiciary protects an Article III judge from criticism by his peers as a matter of law, he misreads the Constitution and ignores historical precedents. Article III federal judges by the nature of their office live in the eye of the storm. Their very independence evokes disagreement and challenge. The public, the bar, the law schools, the press all comment relentlessly on judicial conduct. As public servants, judges cannot expect to be immune from criticism. That a judge's peers may find his behavior unacceptable is of no particular added consequence. Certainly, within the adjudicatory process itself a judge may receive sharp rebuke. The Act does no more than to assure fair hearing for the judge facing possible discipline. Contrary to Judge Hastings' repeated and strident claims, the Act's disciplinary mechanism does nothing to encroach upon the essential independence of judges to decide cases in accord with their understanding of the law and to rule accordingly. In fact, Congress in this instance has again scrupulously observed the separation of powers by simply strengthening the judiciary's ability to monitor its own performance. It is the judges themselves who under the Constitution are the proper guardians of the independence and integrity of the third branch, and they must not shirk this trust.

In addition to his separation of powers arguments, Judge Hastings attacks the provisions of the Act on two broad grounds.[23] First, he contends that the standards for misconduct are vague and overbroad. Second, he contends that the Act denies due process to judges under inquiry. Again, these challenges to the Act must be rejected.

### B. *Vagueness and Overbreadth* [24]

The vagueness claim lacks merit. One standard for conduct subject to investiga-

---

**22.** Ultimately, Judge Hastings' argument collapses of its own weight. He insists that because of the fundamental need to protect judicial independence, impeachment is the sole remedy for judicial misconduct, and that as an essential attribute of impeachment, the power to investigate judicial misconduct cannot be delegated to the judicial branch. Instead, he suggests Congress could establish an elaborate investigative machinery under its own auspices. It is difficult to see how judicial independence would be more protected by lodging the investigative apparatus in a bureaucratic agency or congressional body rather than in the judicial branch itself.

**23.** This case does not focus on other areas of the Act involving disability because of age or illness, early retirement, readjustment of work loads, and other comparable administrative matters because these aspects do not involve Judge Hastings' present difficulties. In any event, the analysis of the statute that follows would lead to no different result were these areas the subject of the constitutional challenge.

**24.** While intertwined, vagueness and overbreadth are different concepts. A law that is overbroad proscribes a substantial amount of constitutionally protected conduct. A vague law is one whose standard is so indeterminate

tion and sanction is obviously conduct that in itself would justify impeachment, since the Judicial Conference may recommend that the House of Representatives consider impeachment. 28 U.S.C. § 372(c)(7)(B), (8). The complaint against Judge Hastings alleges that he conspired to take a bribe and to obstruct justice. It is difficult to imagine any conduct by a judge, if it occurred, more worthy of impeachment. No judge accused of these types of conduct can credibly argue that he lacked advance notice that they were forbidden.

■ Although it is well settled that "[o]ne to whose conduct a statute clearly applies may not successfully challenge it for vagueness," *Parker v. Levy*, 417 U.S. 733, 756, 94 S.Ct. 2547, 2561, 41 L.Ed.2d 439 (1974), Judge Hastings makes a broader challenge that will be considered. He seems to contend that even if some of his alleged conduct clearly is reached by the statute, he is still being investigated for other conduct that is too vaguely defined and that is constitutionally protected. He urges that given the broad scope of the Act, it should not withstand constitutional scrutiny.

[8] The statutory standard, "conduct prejudicial to the effective and expeditious administration of the business of the courts," was necessarily broad.[25] The legislative history notes that this standard was "intended to include willful misconduct in office, willful and persistent failure to perform duties of the office, habitual intemperance, and other conduct prejudicial to the administration of justice that brings the judicial office into disrepute." S.Rep. No. 362, 96th Cong., 1st Sess. 9 (1979), *reprinted in* 1980 U.S.Code Cong. & Ad. News 4315, 4323.[26] The legislative history further notes that this statutory standard was intended to draw guidance from the Code of Judicial Conduct for the United States Judges, published by the Judicial Conference,[27] among other sources. *Id.* In adopting this standard, this Court holds that Congress therefore did not intend to authorize investigation and formal proceedings against a judge for one or two isolated instances of possibly unethical or inappropriate official conduct unless such conduct, by itself, could amount to an impeachable offense. Congress recognized that a clearly established pattern of similar or disparate unethical judicial conduct, if unchecked, could so prejudice the administration of the courts and bring the judiciary into such disrepute that formal disciplinary action would be required.[28] So read, the Act is

that one cannot tell what conduct it proscribes. *See Village of Hoffman Estates v. The Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 494–95, 102 S.Ct. 1186, 1191, 71 L.Ed.2d 362 (1982).

**25.** *Cf. Arnett v. Kennedy*, 416 U.S. 134, 158–64, 94 S.Ct. 1633, 1646–49, 40 L.Ed.2d 15 (1974) (upholding "for cause" removal standard of civil service statute against vagueness/overbreadth attack).

**26.** The House report is to the same general effect. *See* H.R.Rep. No. 1313, 96th Cong., 2d Sess. 10 (1980).

**27.** The Conference's Advisory Committee on Judicial Activities issues advisory opinions interpreting the Code to judges who seek advance guidance for their conduct. These opinions are published regularly by the Administrative Office of the United States Courts.

**28.** It should be stressed that Congress's concern about behavior bringing the judicial office into disrepute was focused on a judge's judicial conduct and not primarily on personal extrajudicial behavior. It was for this reason that a separate standard for misbehavior, "conduct prejudicial to the administration of justice by bringing the judicial office into disrepute," was deleted by the Senate Judiciary Committee for fear that such a general disrepute standard directly embodied in the statute could be used to intrude into a judge's personal life unrelated to his or her judicial conduct. *See* 125 Cong.Rec. S15,-385 (daily ed. Oct. 30, 1979) (statement of Sen. Thurmond). This deletion was not intended to dilute Congress's concern for the public appearance of integrity in the judicial branch. *See also* 126 Cong.Rec. S13,860 (daily ed. Sept. 30, 1980) (remarks of Sen. DeConcini) (Act intended "to remedy matters relating to a judge's condition or conduct which interfere with his performance and responsibilities"). This legislative history further supports the conclusion that the statutory machinery was intended only for impeachable conduct or conduct showing such a pattern of misbehavior as to interfere with a judge's duties or to threaten the public's perception of the integrity of the judicial system.

clearly not vague. *Cf. Roberts v. United States Jaycees,* — U.S. ——, —— – ——, 104 S.Ct. 3244, 3254–57, 82 L.Ed.2d 462 (1984).

Thus the statutory mechanism was intended to be available if no collegial resolution is possible for the relatively rare case where the charges, by their individual weight or by their weight as a pattern taken together, are sufficiently serious to bring into question the integrity of the judicial system itself.[29] The complaint against Judge Hastings, if established, presents such a gross pattern of ethical violations.

Given the Act's clear emphasis on invoking the Act's investigative machinery only for serious misconduct, it was not necessary for Congress to compile an exhaustive catalogue of all forms of misconduct targeted by the Act. Indeed, it would have been impossible, because excepting those most rare cases of single impeachable acts, the pattern and the varied context of an individual judge's behavior must remain critical to determining whether the statute's investigative processes will be invoked. Such an inquiry is too subtle for more rigid legislative codification.

■ Moreover, as discussed above, Judge Hastings' argument that the Act chills his and other judges' constitutionally protected independence fundamentally misconstrues the nature of the judicial independence that the Constitution was intended to protect. He continues to confuse the independence of the judiciary with his desire for unbridled personal independence.[30]

## C. *Due Process*

■ Judge Hastings' due process claims equally lack merit. He contends that the Act creates "a Star Chamber in which the accused has no right to confront the evidence against him." This is patently incorrect. The Act expressly provides a judge under inquiry with, among other rights, the opportunity to appear before the investigating committee, present evidence and compel its production if necessary, as well as to cross-examine witnesses. 28 U.S.C. § 372(c)(10). It is true that the Act does not expressly provide the same confrontational rights in its provision for additional investigation by the Judicial Council, the Judicial Conference or its Standing Committee. But such rights are implicit in the statutory design providing that additional confrontational hearings "may" be held. Congress hardly could have intended to allow a judge's confrontational rights to be sidestepped by the device of allowing him to confront evidence at a foreshortened investigating committee proceeding, saving most of the evidence for presentation at later proceedings at which confrontation would be barred. Fairly read, the Act requires that a judge under inquiry have the right to confront all the evidence against him at whatever stage it is presented.[31] This, of course, does not mean an accused judge has a right to re-confront old evidence at every stage where it is considered. But a judge under inquiry has the right under the Act to confront at some point all the evidence against him, and the Court so holds.

**29.** Indeed, this reading of the Act led Congress ultimately to reject a Senate bill that would have created a special Court on Judicial Conduct and Disability, which would have too easily allowed complaints against judges to be pressed to a formal adversary proceeding with a danger of possibly chilling judicial independence. *See* H.R.Rep. No. 1313, 96th Cong., 2d Sess. 18–19 (1980).

**30.** In addition, the mere presence of a "chilling effect," without some other concrete harm, past or immediately threatened, is insufficient to state an overbreadth claim. *See United Presbyterian Church v. Reagan,* 738 F.2d 1375, 1378 (D.C.Cir.1984). No such harm is alleged here, only a vague and unsupported allegation of a chill to Judge Hastings' judicial independence is urged. Judge Hastings' right to decide cases assigned to him and to state his reasons is not affected.

**31.** The Act's provision for discretionary authority on the part of judicial councils and the Conference to conduct additional investigation if they deem it appropriate, 28 U.S.C. § 372(c)(6)(A), (8), was designed simply to give discretion to hold further hearings, not to withhold due process rights from a judge under inquiry at those hearings.

■ Judge Hastings' contention that the Act impermissibly combines investigative and adjudicatory power, so as to render impossible a fair adjudication, similarly lacks merit. The mere combination of such powers, by itself, does not violate due process. *Withrow v. Larkin*, 421 U.S. 35, 58, 95 S.Ct. 1456, 1470, 43 L.Ed.2d 712 (1975). Judge Hastings simply has made no credible showing that under the procedures established by the Act "the risk of unfairness is intolerably high." *Id.* It is, of course, inevitable that in any peer-review mechanism as established here, members of judicial councils occasionally may have prior knowledge of allegations of misbehavior before they are asked to sit in judgment on such charges. But prior knowledge of some of the facts of a case does not by itself establish bias. *See Withrow v. Larkin*, 421 U.S. at 47–50, 95 S.Ct. at 1464–66; *FTC v. Cement Institute*, 333 U.S. 683, 701, 68 S.Ct. 793, 803, 92 L.Ed. 1010 (1948). To protect against the possibility of actual bias from prior knowledge or personal animosities within a circuit, Congress gave review authority to the more remote and scattered members of the Judicial Conference. The Act thus cannot be said on its face to violate the due process requirement of an impartial tribunal. As for Judge Hastings' particular concerns with the composition of the Investigating Committee and its actions to date, those are not reviewable here. Judge Hastings must follow the statutory review process. *See* 28 U.S.C. § 372(c)(10).

This Court concludes that the Act shows a sensitivity to the procedural rights of judges under inquiry and protects them with adequate care to satisfy the fundamental fairness required by the due process clause.

## D. *Other Issues*

■ Judge Hastings contends the government's refusal to pay for his legal fees to defend against the disciplinary action diminishes his compensation in office in violation of Article III of the Constitution.[32] Congress, of course, is forbidden by the compensation clause from diminishing directly the salary of federal judges. *See United States v. Will*, 449 U.S. 200, 225–26, 101 S.Ct. 471, 485–86, 66 L.Ed.2d 392 (1980). An indirect diminution of a judge's disposable income, triggered by that judge's own conduct, is entirely different. *See Duplantier v. United States*, 606 F.2d 654, 669 (5th Cir.1979), upholding civil penalty provisions of the Ethics in Government Act, 28 U.S.C.App. § 301 *et seq.*, as applied to judges. This claim has no more substance than the contention of judges assigned to duties away from their homes that their compensation is diminished because their *per diem* allowance does not cover actual necessary expenses.[33]

■ Finally, upon further review of this complaint in the light of the foregoing analysis, it is clear that the two remaining counts must also be dismissed, on the Court's own motion.[34] Count Three asks the Court to review the motives underlying Judge Godbold's order instituting the investigation. That order simply is not reviewable by this type of collateral lawsuit, *see* 28 U.S.C. § 372(c)(10), even if Judge Hastings seeks to clothe his request for review in the language of conspiracy. In

**32.** "The Judges ... shall, at stated Times, receive for their Services a Compensation, which shall not be diminished during their Continuance in Office." U.S.Const., art. III, sec. 1.

**33.** This disposition of Judge Hastings' constitutional claim does not foreclose him from pursuing his request for legal fees with the Eleventh Circuit Judicial Council. The decision of the Director of the Administrative Office of the United States Courts on May 6, 1983, to deny his request for legal fees is not conclusive. Legislative history seems clearly to show a congressional intent to pay for attorney fees for a judge under inquiry. *See* H.R.Rep. 1313, 96th Cong., 2d Sess. 22 (1980). *See also* Memorandum of Director of Administrative Office of United States Courts to Judges, Magistrates, Circuit Executives and Clerks of Court, Dec. 30, 1980, at 4 (interpreting statute to authorize payment of attorney fees).

**34.** These counts have not been briefed or argued by the parties. Their lack of merit is so plain that the Court believes it better expeditiously to dispose of the entire case than to leave these remaining claims dangling.

no other respect does Count Three state a cause of action on which relief can be granted.

Count Four states on its face no Privacy Act claim in regard to past actions by the Justice Department, since the Act requires neither that Judge Hastings be notified nor approve of any disclosures made. *See* 5 U.S.C. § 552a(b)(7), (e)(8). The Justice Department memorandum mentioned in paragraph 57 of the amended complaint merely states in most general terms matters already of public record. No violation of the regulations cited emerges. As for future cooperation between the Justice Department and the Investigating Committee, that has been resolved by *In re Petition*, 576 F.Supp. 1275 (S.D.Fla.1983), *aff'd*, 735 F.2d 1261 (11th Cir.1984). Finally, the due process allegations against the Investigating Committee defendants in Count Four represent yet another attempt by Judge Hastings to short-circuit the exclusive review process vested by the Act in the judicial councils and the Conference, and this Court cannot consider them. *See* 28 U.S.C. § 372(c)(10). Thus no cause of action is stated in Count Four.

### Conclusion

For reasons stated, the Court finds that the Judicial Councils Reform and Judicial Conduct and Disability Act of 1980 withstands close constitutional scrutiny and is reasonably fashioned by Congress to improve judicial administration so as to enable the judiciary to preserve and protect its independence. The pending investigation by the Eleventh Circuit of Judge Hastings' behavior will not be enjoined. The complaint is dismissed with prejudice. An appropriate Order is filed herewith.